UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| M.B., by his parents and next friends, | ) | |
| DAMIEN BERNS and AMY BERNS, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:09-cv-0304-TWP-TAB |
| | ) | |
| HAMILTON SOUTHEASTERN | ) | |
| SCHOOLS and HAMILTON-BOONE- | ) | |
| MADISON SPECIAL SERVICES, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment.  Plaintiffs

filed this action seeking judicial review of a decision of the Indiana Board of Special

Education Appeals ("IBSEA"), which upheld the key findings of the Independent Hearing

Officer who determined that Plaintiff had not been denied a "free appropriate public

education" ("FAPE") under the Individuals With Disabilities In Education Act ("IDEA"),

20 U.S.C. § 1400 *et seq*., and the rules established by the Indiana State Board of Education

for special education services, 511 IAC § 7-17 *et seq*. (2007).[1]  For the reasons set forth

---

[1]Congress enacted the Education of the Handicapped Act in 1970 for the purpose of
ensuring that all children with disabilities receive a "free appropriate public education" or FAPE,
emphasizing the provision of  special education and related services designed to meet the unique
needs of such children.  It was renamed the Individuals With Disabilities In Education Act in
1990. *Forest Grove School Dist. v. T.A., __ U.S. __,* 129 S.Ct. 2484, 2491 n.6 (2009).

The substantive state administrative rules applicable to this case are those which were a
(continued...)

below, the Court DENIES Plaintiffs' Motion for Summary Judgment (Doc. #22) and

GRANTS Defendants' Motion for Summary Judgment (Doc # 24).

### Background

M.B., a minor child, suffered a traumatic head injury on October 28, 2007, while

playing at his grandparents' house.  He was four years old at the time of the accident.  He

was discharged from the hospital on November 2, 2007 in good condition and placed in a

rehabilitation program, including speech and physical therapy.  Thereafter, the parents hired

---

[1](...continued)
part of the 2007 edition of the Indiana Administrative Code.  The Indiana State Board of
Education filed new administrative rules in July of 2008, after the request for administrative
hearing was made by M.B.'s parents. In the 2007 Administrative Code, the Board defined FAPE
at 511 IAC § 7-17-36 (2007) as:

"Free appropriate public education" means special education and related services that:

(1) are provided at public expense, under public supervision and direction, and at
no cost to the parent;
(2) meet the standards of the state educational agency, including the requirements
of this article;
(3) include early childhood education, elementary education, or secondary
education;
(4) are provided in conformity with an individualized education program that
meets the requirements of this article;
(5) are provided to ensure students identified as eligible for special education and
related services under this article have an equal opportunity to participate in
activities and services available to all other students;
(6) are provided to the student during a period of removal subsequent to removal
for ten (10) cumulative instructional days during the school year; and
(7) include the award of credit and diploma for completion of academic
requirements to the same extent such credit is awarded to students without
disabilities.

Dr. Bryan Hudson, a neuropsychologist, to conduct an evaluation of M.B.

M.B.'s parents contacted Defendants in November 2007 to inquire about special education services. On December 7, 2007, M.B. and his parents met with Jennifer Freeman, a school counselor employed by Defendant Hamilton Southeastern Schools, to request an evaluation of M.B. and regarding M.B.'s potential receipt of special education services. Though M.B's age did not render him eligible to begin Kindergarten until the fall of 2008, the school system also supported pre-school programs and the Indiana State Board of Education mandated (for special education purposes) that public schools provide a "free appropriate public education" to students who are at least three but less than twenty-two years old. 511 IAC 7-18-2(a) (2007).

The appropriate consent forms to initiate the evaluation procedures were provided to the parents, who completed the forms and returned them on January 24, 2008. An initial case conference was scheduled for April 30, 2008, which was within the sixty (60) instructional day period following the school's receipt of consent during which an evaluation must be conducted and a case conference convened pursuant to 511 IAC 7-24-4(b) (2007). Ms. Freeman attempted to schedule the initial case conference earlier, but the parents wanted Dr. Hudson to participate and he was unavailable at the earlier suggested date.

Dr. Hudson found that M.B. "performed relatively well" in all the testing that was performed, but also concluded that "academic intervention will be likely to facilitate smooth

transition from the home to the formal academic environment." Dr. Hudson's evaluation of M.B. revealed a "borderline to mild, acute neurocognitive impairment," and the school relied upon Dr. Hudson's testing because of its recency. His testing resulted in an assessment that M.B.'s conceptual skills were average for his age and his overall level of cognitive functioning was good with a General IQ of 112, Verbal IQ of 92 and Visual IQ of 132, all within the average to superior ranges. However, Dr. Hudson also predicted that M.B. would be easily overwhelmed with environmental stimulus, thereby resulting in behavioral and emotional issues. Dr. Hudson stated that if the school offered year-round or full day Kindergarten, such programs would be the "ultimate" for M.B.

M.B.'s pediatrician, Dr. Laura Wilner, reported that while M.B. reportedly exhibits overly aggressive and emotional behaviors at home, he was responding well to direct therapies and she recommended that M.B. be exposed to a more structured environment than the private daycare he was currently receiving and believed that school programs would be most appropriate. Dr. Wilner indicated that M.B. became extremely agitated while playing a hand held game and at times exhibited speech articulation difficulties. His right ear hearing deficiency was being addressed with a hearing aid, but he was known to frequently turn it off when he did not want to listen to his parents.

The school psychologist conducted a psychoeducational evaluation on April 2, 2008, which took into consideration, among other things, information provided to her by M.B's parents, who rated his practical skills as below average and social skills as average for a child

4

his age.  Utilizing the ABAS-II measures, his parents rated M.B's behavioral functioning to be normal as well.  At the April 30, 2008 initial case conference, the committee (the "CCC")[2] determined that M.B. qualified for special education services under the labels of "communication disorder" and "traumatic brain injury" as those terms are used by the state in defining a student's eligibility for special services.

The CCC recommended that M.B. attend the Early Childhood Services (ECS) program four days per week for a total of 12.5 hours and receive additional services consisting of speech therapy 2 hours per week and a twenty minute session of occupational and physical therapy respectively per week, all in an effort to make progress toward various measurable goals.  Though M.B.'s hearing aid seemed to have corrected his hearing loss in his right ear, he was to be evaluated during the first four weeks of ECS to determine if an FM hearing assistance system might be required as well.

An individualized education program (IEP) was developed by the CCC and it was agreed by all that M.B. would continue on past the regular school year and participate in the extended year ECS program during the month of June.  Moreover, the CCC agreed to meet again before the conclusion of the regular school year program to assess progress and address further needs, including the special services which may be needed for the 2008-2009 school

---

[2]The Indiana special education administrative procedures require that case conference committee or CCC participants include the parents of the child at issue and various qualified individuals, such as teachers, counselors and other school system representatives who are designated by the school system based upon the purpose of the conference. 511 IAC § 7-27-3 (2007).

year when M.B. was expected to enter Kindergarten.  At this point, the parents agreed with the goals and services to be provided by the school.

Dr. Hudson participated in the April conference via telephone and indicated that M.B. would benefit from full day Kindergarten, if it were available.  The parents were informed that the school system did not offer a full day Kindergarten curriculum, but rather had separate morning and afternoon sessions, which were identical in substance.  Immediately following the close of the conference, while still talking with some of the individuals who had participated, M.B.'s parents inquired further about whether M.B. would be allowed to be in both morning and afternoon Kindergarten sessions.  They were told that this could be decided at the next conference when another individual with more administrative authority would be attending.  It is clear from listening to the recorded discussions, that M.B.'s parents were under the impression that full day attendance in the two Kindergarten sessions would likely be approved.[3]  Following the conference, a written copy of the IEP was made available to the parents.

The next case conference was held on May 29, 2008.  It was reported that, through

---

[3]The impression left on the parents by the school representative is discernable from listening to the audio recording of the initial conference and post conference discussions, which were recorded surreptitiously by M.B.'s parents.  While the representative from the ECS program may have intended to represent that there were several prior instances when children in the ECS program (as opposed to Kindergarten) attended for an entire school day, it is apparent to the Court that this was not how the parents interpreted her representations.  In particular, the representative's statement that approval was "a formality" could well have been interpreted to mean that approval of attendance at both Kindergarten sessions was inevitable.

the ECS program, M.B. was making progress toward the goals that had been set for him at the initial conference by the first CCC and had advanced past the need for physical and occupational therapy.  M.B.'s instructor in the pre-school program indicated that although he occasionally became frustrated, his demeanor was essentially "flat," he was not yelling or being aggressive, and he was exhibiting very good behavior.  He was doing well with his speech and language skills and was able to follow a daily routine independently.  It was recommended that he continue to be monitored for hearing-related issues, but the teacher for the hearing impaired indicated that with appropriate placement in the classroom away from outside noises, the ear in which he had no hearing loss would likely compensate for the 1/3 loss in the other ear, which could negate any need for an FM system.

The subject of an extended program was raised at the May conference.  The parents were insistent that M.B. should be allowed to attend Kindergarten for a full day.  A review of the audio recording from the May conference suggests that at times the terminology used by participants was not consistent and may have added some initial confusion to the discussion.[4]  The school representatives attempted to explain that "full day" Kindergarten with a full day curriculum was an optional general education initiative (as opposed to special education services) that some school systems offered to their constituency, but that such an option was not currently being offered by this school system, which offered only the duplicative a.m. and p.m. sessions.  School representatives suggested that M.B. might benefit

---

[4]M.B.'s parents surreptitiously recorded this conference as well.

from an extended day where he would have his special services provided prior to or after attendance at the regular Kindergarten session.  Another suggestion was made regarding M.B's possible participation in a program known as "Kindergarten Plus," which included activities at the local YMCA that were coordinated with, but not a part of, the regular school program and for which the parents would bear some financial responsibility.  Nevertheless, the school representatives made it clear that the option of M.B. attending both a.m. and p.m. sessions was not a special education program offering and that, based on M.B.'s performance during his first four weeks in the early childhood program, he was making progress toward his goals.  Accordingly, the school representatives believed that the individualized education program ("IEP") being offered was appropriate.

Amy Berns, M.B.'s mother was very emotional toward the end of the conference and insistent that the school allow M.B. to attend both morning and afternoon Kindergarten sessions because Dr. Hudson had stated that all day Kindergarten would be "the ultimate" for M.B.  Further progress was not made at the conference and it was  suspended with M.B.'s mother indicating she wanted to take the issue up with the school Superintendent. Neither Dr. Hudson nor M.B.'s father participated in the May conference.

Dissatisfied with the results of the second case conference, M.B.'s parents made a request for a due process hearing with the Indiana Department of Education on June 11, 2008, naming the Defendants as respondents.   Meanwhile, M.B. attended the extended school year ECS program during the month of June.  His teacher in the program noted that

8

M.B. was working independently and exhibited continued improvement toward all the goals agreed upon by the CCC at the first conference.  Tom Bell, the school's Special Education Director, communicated with the parents regarding the continuation of services to M.B. through the extended school year program for the month of July and he attempted to reconvene the CCC for purposes of discussing the same; however, the parents responded that on the advice of counsel they would not participate in any CCC meeting, but would attend a mediation or resolution session.  The School declined to participate in a formal mediation or resolution session, opting instead to respond to Plaintiffs' request for a due process hearing.

The Indiana Department of Education assigned an Independent Hearing Officer ("IHO"), Dr. James Jacobs, to handle the due process hearing.  The hearing was held over the course of four days in August and the IHO entered his decision on October 8, 2008, finding in favor of the school and concluding that M.B. had not been denied a FAPE by the Defendants.  The parents appealed the IHO's decision to the IBSEA, which also found in favor of the school on the vast majority of issues raised.  The IBSEA also found that any procedural violations did not interfere with M.B.'s receipt of a FAPE.  Pursuant to the IDEA, 20 U.S.C. § 1415(i)(2), the parents have brought this civil action on behalf of M.B., seeking a determination by this Court that M.B. was denied a FAPE, reimbursement for "compensatory damages," payment of attorney fees and any other remedy this Court might find appropriate.

## *Standard of Review*

In cases brought before this Court under the IDEA, the summary judgment standard differs from what typically guides its review. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). The IDEA provides that in reviewing the outcome of a Due Process Hearing, a court: (1) "shall receive the records of the administrative proceedings"; (2) "shall hear additional evidence at the request of a party"; and (3) "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The party bringing the civil action and challenging the outcome of the state administrative proceedings has the burden of proof. *Alex R. ex rel. Beth R. v. Forrestville Valley Comm. Unit School Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004).

The hearing officer is not entitled to deference on issues of law. *Id.* "On issues of fact, however, district courts must accord 'due weight' to the decision of the hearing officer." *Id.* "Because school authorities are better suited than are federal judges to determine educational policy, the district court is required, in its independent evaluation of the evidence, to give due deference to the results of the administrative proceedings." *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002). The degree of deference depends on how much new evidence is received by the district court - the more new evidence received, the less deference required. *See Alex R.*, 375 F.3d at 612. Where, as here, there has been no request

to consider evidence outside the administrative record,[5] the Court "owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'" *Id*. (citation omitted).  This level of review is essentially the same as the clear error or substantial evidence standards. *Id*.

### *Discussion*

First, from a chronological standpoint, Plaintiffs maintain that the school failed to adhere to its "child-find" obligations under 511 IAC § 7-25-1 (2007), which provided that "[N]o student shall be denied a free appropriate public education as a result of a public agency's inability to obtain parental consent ...."  At issue is the parents assertion that the school stalled in providing M.B. with services.  To bolster this argument, Plaintiffs highlight that they first contacted the school in November 2007 and met with a school official in December 2007, but that the school did not deliver services until May 2008.  However, this argument is belied by the facts.  The parents failed to complete and return the consent forms immediately, thereby causing a modest delay.  By administrative rule, the school *must* obtain parental consent.  511 IAC § 7-25-4(b) (2007).  In the end, there is no question that the school met its obligations by convening a case conference within the sixty (60) instructional

---

[5]There were two affidavits and a newspaper article submitted along with Plaintiffs' Motion For Summary Judgment, but the Court affords them no significance because the parties had already agreed that this case would be decided based upon  the administrative record alone [*see Joint Motion Requesting Relief From Case Management Plan (Doc. #11),* which the Court Granted (Doc. #15)].  Even if the Court did consider them, however, they do little more than reinforce evidence already within the record.

day period following its receipt of parental consent.    In this respect, the school did not commit a "child-find" or procedural violation.  511 IAC § 7-25-4(b) (2007).

This Court is mindful that M.B. has long since moved on from Kindergarten.  In fact, his family established legal settlement for M.B. in another school district midway through the 2008-2009 school year. The Court assumes, though unnecessary to its decision,  that he is now being provided services pursuant to a new IEP developed by that school system and, consequently, that despite the wide discretion vested in the Court by the IDEA to provide equitable relief, nothing the Court does in response to this complaint will affect the manner in which he is currently receiving special education services.  At bottom, this case turns on whether or not the parents are entitled to reimbursement for private services and, potentially, attorney fees.[6]

Where only compensatory relief is sought under the IDEA, the more important question is whether the school district provided a FAPE – not whether it complied with the procedural requirements of the IDEA. *Garcia v. Board of Educ. of Albuquerque Public Schools,* 520 F.3d 1116, 1125-1126 (10th Cir. 2008) ("But where, as here, only

---

[6]In their response brief, Plaintiffs describe their remedial request as follows:

*The Plaintiffs seek reimbursement of the costs associated with the private placement of M.B. in the Lindamood Bell program, and any and all other appropriate remedies for the student, M.B., and his parents including, but not limited to, reimbursement of all expenses incurred for the education of M.B., and for private therapy prior to January 6, 2009, and of all reasonable attorney fees incurred in the administrative proceedings as well as in the instant action.*

compensatory relief is sought, the pivotal question is [whether the school district provided a FAPE], because an award of compensatory education vindicates the student's *substantive* right to receive a FAPE and compensates for a past deprivation of educational opportunities rather than a deprivation of purely procedural rights."). Consequently, the procedural deficiencies asserted by the Plaintiffs in this case are of real import only if these deficiencies denied M.B. a FAPE. At the time of the May case conference, the denial of enrollment in both morning and afternoon Kindergarten was based on M.B.'s positive progress and an administrative policy. Thus, the lack of a general Kindergarten teacher at the May CCC did not affect the placement for M.B. the school was offering to provide. Hence, that alleged procedural violation had no impact on a FAPE for M.B. Similarly, the lack of an administrator at the May conference with authority to "authorize" enrollment of M.B. in both sessions of Kindergarten did not violate any of Plaintiffs' rights. A school is not required to have someone in attendance at a case conference who is authorized to execute on any demand made by the parents.[7]

Other actions the parents chose to take have further limited the scope of appropriate remedies. The parents agreed with the goals and services plan developed by the CCC from the initial conference. It is abundantly clear from listening to the recordings of the two case

_____

[7] In their Response Brief (Doc. # 27), Plaintiffs rely heavily on *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004). This case, albeit helpful, does not change the overriding finding that M.B. was not harmed substantively and was provided a FAPE. *See Deal*, 392 F.3d at 854 ("Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted.").

conferences that the parents had no quarrel with the level of services that the school was providing to M.B. in the ECS program.  Further, the parents did not disagree with the progress levels being reported; nor did they find fault with the services that the school was offering to provide in the ECS program for June.

Before the parents elected not to participate in any further case conferences, they took exception with a single issue: the enrollment of M.B. in both Kindergarten sessions.  It would be inequitable to allow the parents, who cut off all participation in the CCC at a point in time when there was no disagreement on current services, to recover compensatory damages for a failure to provide FAPE during a time period for which they had participated in approving the progress goals and the IEP to be followed.

After all, whether the IEP in effect at the time of the May conference was appropriate can only be judged by examining what was objectively reasonable at the time. *Roland M. v. Concord School Committee,* 910 F.2d 983, 992 (1st Cir. 1990).  When the parents have agreed with the goals and services offered by the school, the Court should not engage in a reexamination with hindsight that is enlightened by additional evidence or information not provided or available to the CCC at the time of either case conference.  This is especially true when the parents chose to abandon the mandated interactive process without ever having questioned those services or offered alternative suggestions (other than their pursuit of all day attendance in Kindergarten when the regular school year began).

14

As pointed out by Defendants, Plaintiffs' argument that the school violated the "stay-put" provisions of 511 IAC 7-45-7 by not keeping M.B. in the extended school year ECS program for July 2008, is first raised in their briefs and is not a claim identified in their complaint.  More importantly, such a claim was not developed during the course of the hearing before the IHO; nor was it an issue identified by Plaintiffs on appeal to the IBSEA. As such, they failed to exhaust their administrative remedies as required by the IDEA.  20 U.S.C. §1415(l); *Stanley C. v. M.S.D. of Southwest Allen County Schools,* 628 F.Supp.2d 902, 980-81 (N.D. Ind. 2008) (parties petitioning the IBSEA must specifically identify the issues on which they take exception to the IHO's determination).  Furthermore, ignoring the school's offer to discuss continued ECS services in July, the parents, without agreement from the school, placed M.B. in the private Lindamood-Bell program sometime in July, making it much more difficult for them to maintain that the school somehow abandoned its obligations.

Procedural issues aside, one paramount question lies at the heart of this dispute: Did the refusal of the school to allow M.B. to attend duplicative daily Kindergarten sessions amount to a denial of a FAPE? The Court believes the answer to this question is "no." "[S]chool districts are not required to do more than provide a program reasonably calculated to be of educational benefit to a child; they are not required to educate the child to his or her highest potential." *Evanston Comm. Consolidated School Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004); *see also Board of Educ. of Hendrick Hudson Central School*

*Dist., Westchester County v. Rowley*, 458 U.S. 176, 204 (1982) (recognizing that an IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."). Arguably *any* student – disabled or not – benefits academically by receiving repetitive instruction and attending more hours of school. However, given the reality of limited resources, Congress, in passing the IDEA, did not require a school to devote limitless resources to take a disabled child to the height of his potential.

> By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful. Indeed, Congress expressly "recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." S.Rep., at 11, U.S.Code Cong. & Admin.News 1975, p. 1435. Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

*Rowley*, 458 U.S. at 192. Overall, the school provided resources and services that were reasonably calculated to enable M.B. to receive educational benefits. The evidence indicates that M.B. was making progress – advancing academically and keeping pace with his peers. *See Rowley*, 458 U.S. at 209-220 (the fact that the student was performing better than average in her class and was advancing easily from grade to grade supported the conclusion that the school complied with the substantive requirements of the IDEA); *see also Todd v. Duneland School Corp.*, 299 F.3d 899, 905-07 (7th Cir. 2002) ("[G]iven the lack of regression, R.T.'s ability to progress, and our deference to the BSEA, the Court finds no error in the defendants' rejection of an extended school year."). Under the operative standards, the

16

school complied with the IDEA's requirements.

Here, the Court need not decide whether a school can *ever* be made to offer a student enrollment in both of its identical half day Kindergarten sessions.  Moreover, even if the Court were to determine that the mandates of the IDEA required the school to enroll M.B. in both Kindergarten sessions, to be entitled to the compensatory reimbursement that the parents seek for M.B.'s educational expenses and private therapy, they must demonstrate both: (1) that the IEP offered by the school was not providing a FAPE; and (2) that the private placement was appropriate to the child's needs. *Todd*, 299 F.3d at 905.  They have done neither.

As the Court and the hearing officer have noted, at the time the parents drew a line in the sand, all indications were that the IEP in place was producing results.  Moreover, nothing in the record indicates that the proposed IEP for M.B.'s Kindergarten year would not have yielded similar positive results.  Therefore, the Court must defer to the determinations of the IHO and the IBSEA, which both determined that M.B. was receiving a FAPE.  Further, the record shows that, at all times, the school was amenable to monitoring and adjusting the IEP – an evolving process rather than a rigid predetermination.  By refusing to participate in further conferences and unilaterally removing M.B. from his placement with Defendants, the parents eliminated the school's ability to make any such adjustments.

17

Finally, the same criteria that govern whether a school district's placement plan for a student is appropriate also govern whether the parents' private placement is appropriate. *Gagliardo v. Arlington Central School Dist.,* 489 F.3d 105, 112 (2nd Cir. 2007). Further, the parents seeking reimbursement bear the burden of proving the private placement was appropriate, even if the IEP is inappropriate. *Id.* Here, Plaintiffs offered no evidence at the IHO hearing on the appropriateness of the Lindamond-Bell Learning Process program, which Mr. Berns indicated M.B. began attending in approximately mid-summer 2008. When asked at the hearing if the parents had any information on this private program, Mrs. Berns testified that they had none. Without evidence demonstrating that the private programs, which the parents paid for, provided appropriate educational benefits, the Court cannot order the Defendants to provide reimbursement, regardless of how it might view Defendants' refusal to enroll M.B. in both morning and afternoon Kindergarten for the 2008-2009 school year.

In the end, Plaintiffs were not well served by their decision to stop interacting with the CCC. Continued monitoring and conferences may or may not have been able to convince the Defendants to alter their decision with regard to duplicative Kindergarten sessions for M.B. That said, at the time the parents stopped interacting, the available information indicated that M.B. was indeed making progress in the ECS program. To reiterate, regardless of every parent's desire to have their child afforded the "ultimate" opportunities to succeed, public school systems are not obligated by the IDEA to do more than assure that students such as M.B. are afforded services that will give them the opportunity to make reasonably significant academic and social advances in light of their disabilities.

18

*Conclusion*

The Court concludes for the reasons expressed in this entry that Plaintiffs have failed to carry their burden of demonstrating that M.B. was denied a FAPE during any period of time and therefore the Court DENIES Plaintiffs' Motion For Summary Judgment (Doc. #22) and GRANTS Defendants' Motion For Summary Judgment (Doc. #24).  A separate judgment shall issue in favor of Defendants.

**IT IS SO ORDERED.**

Dated: __08/10/2010__

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Andrew Anthony Manna
CHURCH CHURCH HITTLE & ANTRIM
andrew@cchalaw.com

Mitchell M. Pote
LAW OFFICE OF MITCHELL M. POTE
mitchell.pote@gmail.com

19